## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DURA MEDIC HOLDINGS, INC. CONSOLIDATED LITIGATION | ) ) | Cons. C.A. No. 2019-0474-JTL |

## POST-TRIAL OPINION ADDRESSING CONTRACT CLAIMS

Date Submitted: December 19, 2024
Date Decided: February 20, 2025

Raymond J. DiCamillo, Robert L. Burns, Matthew W. Murphy, Kyle H. Lachmund, Sandy Xu, Alfred P. Dillione, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David L. Barrack, WINSLETT STUDNICKY MCCORMICK & BOMSER LLP, New York, New York; *Counsel for Greg Bailey*; *Karen Lee Bryant*; *Gary Lee Campbell*; *Selle D'Shanna Campbell*; *Robert Chicoine*; *Crown Predator Holdings 1, LLC*; *DM Seller Representative LLC*; *James T. Doody*; *Grant Eckberg*; *Tim Einwechter*; *Jessica Evans*; *Deborah Fedorak*; *Rick Ferreira*; *Fisher Holdings LLC*; *G&D Progressive Services, Inc.*; *Kevin J. Harrington*; *Sherrie Horton*; *Becki Jaynes*; *KLBK Investments, LLC*; *Lewin Investments, LLC*; *Marc Mazur*; *Steven Mintz*; *Steve E. Nelson*; *Don Newton*; *Mark Newton*; *Stephen J. Nicholas, MD*; *George Shelton Ochsner*; *Stephen Ochsner*; *Jason Pauletto*; *Richard A. Danzig Profit Sharing Plan & Trust*; *Martin J. Rucidlo*; *Kim Sauber*; *Gavin Scotti*; *Morton Stayton*; *Steve E. Nelson Trust*; *Symcox Family Limited Partnership*; *Jay Symcox*; *Ellen Walsh*; *WIU Foundation*; *and Edward J. Zecchini.*

David S. Eagle, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Stuart Singer, Carl Goldfarb, BOIES SCHILLER FLEXNER LLP, Fort Lauderdale, Florida; *Counsel for Jonathan Black*; *Maneesh Chawla*; *Comvest Investment Partners Holdings, LLC*; *Dura Medic Holdings, Inc.*; *Dura Medic, Inc.*; *Dura Medic Parent Holdings, LLC*; *and Roger Marrero.*

Steven L. Caponi, Megan E. Hunt, K&L GATES LLP, Wilmington, Delaware; *Counsel for AdaptHealth, LLC, and DM Acquisition Sub LLC.*

**LASTER, V.C.**

A private equity firm acquired a privately held company through a reverse triangular merger. The acquired company performed terribly.

The private equity buyer brought contract claims against the selling stockholders. The buyer alleges the sellers breached three representations in the merger agreement. The first addressed the company's collection rate and earnings. The second represented that the company had not received notice that any material customers were terminating or limiting their accounts, except as disclosed on a related schedule. The third represented that the company was not subject to any audits, again except as disclosed on a related schedule.

At trial, the buyer failed to prove the first claim. The sellers did not make any representations about the company's collection rate and earnings except to state that particular figures were used when preparing the company's financial statements. The sellers made good-faith estimates of both figures and used them when preparing the financial statements. The buyer did not obtain a representation about a future collection rate or level of earnings.

The buyer succeeded in proving that the sellers failed to disclose the imminent loss of two significant customers. The buyer proved that the breach caused $2,847,890 in damages.

The buyer also succeeded in proving a failure to disclose audits. The buyer proved that the breach caused $100,000 in damages.

The sellers counterclaimed for breach of the merger agreement. The sellers contend that the buyer intentionally withheld billings and depressed the company's

earnings to gin up a claim for breach of a representation and avoid paying a note that was part of the merger consideration. At trial, the sellers failed to prove their claim. The buyer withheld bills as part of a good-faith effort to meet federal requirements for invoices, not to depress the earnings of the company or avoid paying the note.

Judgment will be entered for the buyer.[1]

## I.    FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Having evaluated the credibility of witnesses and weighed the evidence, the court makes the following findings.[2]

### A.    The Company

In 2004, Mark Newton co-founded Dura Medic, Inc. ("Dura Medic" or the "Company"). As its name implies, the Company supplied durable medical equipment ("DME"), such as crutches, splints, and braces.

The Company conducted business using a stock-and-bill model. That means the Company entered into contracts with hospitals to stock a supply closet with DME.

---

[1] This decision addresses a subset of the claims in this consolidated case. One of the sellers, a co-founder who rolled over his equity into an upstream parent of the post-merger company, asserted derivative claims challenging the private equity firm's management of the company and its later asset sale to a strategic buyer. The sellers also alleged the asset sale was a fraudulent transfer. The court addressed those claims in its first post-trial decision, *In re Dura Medic Holdings, Inc. Consolidated Litigation* (*Dura Medic I*), 2025 WL 323796 (Del. Ch. Jan. 29, 2025).

[2] The parties agreed to stipulations of fact in the pre-trial order, cited as "PTO ¶ __." Citations in the form "[Name] Tr. __" refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep. __" refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. When more convenient, references to trial exhibits use internal paragraphs or sections.

The hospital did not pay the Company for this service. Instead, when a physician prescribed an item of DME, the hospital would take the item from the supply closet and provide it to the patient. The hospital would notify the Company, and the Company would bill a third-party payor, typically a private insurer or a government health insurance program like Medicare or Medicaid. Before the merger, Medicare claims made up about 20% of the Company's gross billings. Sometimes—but rarely— the Company billed the patients. The Company also sometimes negotiated with a hospital to pay cost for any item of DME where the Company otherwise would go unpaid.

The Company did not expect to collect on every claim, but it could operate profitably if it charged sufficiently high prices and collected on enough claims. From 2015 through the first half of 2017, the Company generally billed at 200% of the standard Medicare fee schedule. At that rate, the Company could generate profits even if it collected on a relatively small percentage of claims.

The Company's financial statements distinguished between the gross amount billed, known as "Gross Patient Revenue," and the net amount the Company collected, known as "Net Patient Revenue." The Company recognized Gross Patient Revenue when billed. To derive Net Patient Revenue, the Company started with Gross Patient Revenue and deducted a "Net Revenue Adjustment," representing amounts that the Company likely would not or in fact did not collect.

The Company calculated Net Revenue Adjustment by adding together "Contractual Adjustments," "Bad Debt Expense," and "Adjustments to Patient

3

Revenue." The Contractual Adjustments estimated the amount of Gross Patient Revenue that the Company would not collect based on historical averages. The Company applied the Contractual Adjustment when it billed the payor. As of June 2017, the Company used a Contractual Adjustment of 70%, meaning the Company estimated that it would only collect 30% of Gross Patient Revenue.

The Bad Debt Expense reflected amounts the Company no longer expected to collect. The Company based the Bad Debt Expense on the actual accounts receivable in the billing system that management wrote off as uncollectable.

The Adjustments to Patient Revenue represented amounts that the Company billed directly to patients but could not collect. Because billing patients directly involved high collection risk, the Company often negotiated with hospitals to bill them at cost for unpaid patient claims.

The Company referred to the ratio of Net Patient Revenue to Gross Patient Revenue as its "Gross-to-Net Ratio," "Gross-to-Net Cash Conversion Ratio," or "GNR." The resulting percentage used Net Patient Revenue as the numerator and Gross Patient Revenue as the denominator.

The Company's collections were unpredictable, both as to timing and amount. The Company collected the bulk of its payments within a year, but some receivables remained outstanding longer, and some could linger for five to seven years. Eventually, management wrote off the amounts it could not collect.

4

**B.     The Company's Pre-Merger Performance**

From 2006 to 2013, Newton ran the Company. During this period, it "limped along" financially. Newton Tr. 17. That changed in late 2013, when Grant Eckberg and his spouse Deborah Fedorak took over the Company's operations. Both were early investors in the Company.

Eckberg became CEO and managed the Company's day-to-day operations. Fedorak served as CFO. Having Eckberg and Fedorak at the helm freed up Newton to focus on what he did best: establishing and maintaining relationships with hospital clients. He took on the title of chief marketing officer.

With Eckberg and Fedorak in charge, the Company generated healthy revenue. Between 2014 and 2017, the Company increased its yearly revenue from about $3.5 million to $12 million.

During the same period, however, the Company's Gross-to-Net Ratio steadily declined. In other words, the Company was submitting claims with a higher aggregate dollar value, but it was getting paid at an increasingly lower rate. As long as that trend continued, the Company's financial statements risked overstating the Company's value by understating the amount of revenue the Company could eventually collect.

**C.     Early Regulatory Activity**

By 2016, the Company's claims began to attract regulatory scrutiny. The Centers for Medicare and Medicaid Services ("CMS") administers Medicare and Medicaid. CMS regulations impose requirements that payees must meet when

submitting claims. For example, CMS requires that any claim for DME include the doctor's signatures, the patient's signatures, and item descriptions.

CMS contracts with private firms to administer and enforce its requirements. The pertinent types for this case are Medicare Administrative Contractors ("MACs"), Zone Program Integrity Contractors ("ZPICs"), and Recovery Audit Contractors ("RACs").[3]

MACs are private healthcare insurers that manage Medicare claims in designated geographical regions. A MAC can deny payment if a claim lacks the required documentation. MACs also conduct prepayment reviews of some or all of a provider's claims. When conducting a prepayment review, a MAC may require the provider to provide additional documentation, such as information demonstrating that the equipment was medically necessary.

MACs also administer the Target Probe and Educate Program ("TPE"). Under that program, a MAC identifies a provider with a high claim error rate, reviews a sample of twenty to forty claims, then provides feedback to the provider about the errors in the sample and how the provider can improve. A TPE audit can involve multiple rounds of review. If a provider fails the first round, then the provider has

---

[3] Some ZPICs are now called Uniform Program Integrity Contractors ("UPICs"). ZPICs and UPICs are functionally identical, with ZPICs maintaining the zone terminology from an earlier version of the CMS regime. Over time, UPICs have replaced ZPICs. For simplicity, this decision uses the ZPIC nomenclature.

forty-five days to improve its procedures, and the MAC conducts a second round of review. The process can continue through at least three rounds.

If a provider does not show sufficient improvement after three rounds, then the MAC can refer the provider to CMS for further review plus a range of possible consequences. If warranted, CMS can revoke the provider's authorization to submit claims to Medicare. CMS may also refer a provider to the Office of Inspector General, which can pursue litigation against the provider or impose civil or criminal penalties.

ZPICs audit claims that providers have submitted to Medicare to ensure compliance with CMS rules. ZPICs focus their audits on potential fraud, waste, abuse, and overpayments. ZPICs can audit claims before providers have been paid and require additional documentation before approving the claim. ZPICs also can audit claims that already have been paid.

RACs investigate whether Medicare or Medicaid paid non-compliant claims. A RAC can pursue a provider for any improper payments.

On June 1, 2017, a ZPIC named Health Integrity, LLC, informed the Company it would be reviewing selected claims. Health Integrity was the ZPIC for Zone 4, so this decision calls it the "Zone 4 ZPIC."

On July 10, 2017, a RAC named Performant Recovery, Inc. (the "RAC Auditor") contacted the Company as part of a nationwide review aimed at identifying improper Medicare payments. In the letter, the RAC Auditor told the Company that it was no longer reviewing a list of Company claims from 2016 and 2017 (the "2017 RAC Audit"). The RAC Auditor did not say whether or not it was reviewing other claims.

7

**D.      The Company Explores A Potential Sale.**

In spring 2017, the Company's board of directors decided to explore a sale or other strategic transaction. To reduce the level of concern that buyers might have about the Company's financial performance, the Company commissioned a quality-of-earnings report from FTI Consulting Inc.

FTI calculated that the Company generated $7.5 million in EBITDA for the trailing twelve months ending June 30, 2017. FTI estimated EBITDA using a Gross-to-Net Ratio of 29.7%. That ratio assumed a Contractual Adjustment of 70%. FTI observed that the Company "calculate[d] contractual adjustments using a [year-end] hindsight review of closed-out patient accounts." JX 16 at 21. FTI concluded that "[m]anagement's contractual process appears reasonable." *Id.*

The Company hired Covington Associates, a boutique investment bank, to contact potential buyers. The Company hired Tim Einwechter as a consultant to help with the sale process. The Company also contracted with Rick Ferreira, then chairman of the board, to help with the sale process as a paid consultant.

In September 2017, Covington pitched the Company to Jonathan Black, an executive partner with a private equity firm known as Comvest Partners. At Comvest, executive partners are former executives charged with looking for deals in sectors that align with their experience. If a deal looked sufficiently attractive, then Comvest could back the executive partner in an acquisition.

Black had been chief development officer and later chief executive officer at Liberty Medical Supply, a DME provider of diabetes testing supplies. After leaving

8

Liberty, Black started his own business manufacturing and selling blood glucose meters and test strips, two other types of DME.

Black recruited Timothy Tidd to help him evaluate the Company. Tidd had been Liberty's chief information officer and chief operating officer.

Black liked the Company and pitched an acquisition to Roger Marrero, a Comvest senior partner and member of its investment committee. Intrigued, Marrero staffed Comvest vice president Will Callahan and associate Gordon Carroll to a deal team. Comvest partner Maneesh Chawla later joined the team.

## E.    The Negotiations

In September 2017, Comvest began conducting due diligence, assisted by a phalanx of advisors. On October 19, 2017, Comvest sent the Company an initial letter of intent (the "Initial LOI"). It contemplated a purchase price of $60 million, based in part on the FTI quality-of-earnings report. The Initial LOI gave Comvest a forty-five-day exclusivity period.

On October 24, 2017, Comvest and the Company executed the Initial LOI. Meanwhile, CMS contractors continued to audit the Company.

- From August 4 to October 26, 2017, a MAC called Noridian Healthcare Solutions, LLC (the "TPE Reviewer") conducted a first round of TPE review. On November 14, the TPE Reviewer informed the Company that twenty-four of the thirty claims it reviewed contained errors, for an error rate of 80%. The TPE Reviewer advised the Company that it would be "moved to the second round of review."[4]

---

[4] JX 49 at 6; *accord* PTO ¶ 70. Company management didn't focus on the TPE audit. Newton testified that he was not aware of it. Newton Tr. 37. Eckberg testified that he "never paid a lot of attention to the TPE." Eckberg Tr. 142. Both claimed that

9

- On December 7, 2017, the Zone 4 ZPIC informed the Company that it was initiating a "comprehensive [prepayment] medical review of [the Company's] billing for Medicare services." JX 67. The Zone 4 ZPIC selected the Company for the review based on an analysis suggesting "aberrancies in your billing." *Id.* The Zone 4 ZPIC later sent the Company several hundred document requests about its Medicare claims. PTO ¶ 71. The Zone 4 ZPIC also told the Company that ZPICs from the areas where patients lived could send additional document requests. JX 67. This decision refers to this audit as the "Second Zone 4 ZPIC Audit," because the Company later learned that it had been the subject of an earlier Zone 4 ZPIC audit.

- In December 2017, AdvanceMed, a Zone 5 ZPIC, sent the Company several hundred document requests about its Medicare claims. Those requests were part of the Second Zone 4 ZPIC Audit.

- In December 2017 and January 2018, SafeGuard Services, a Zone 7 ZPIC, sent the Company eleven document requests about its Medicare claims. Those requests were part of the Second Zone 4 ZPIC Audit.

- On January 5, 2018, the Zone 4 ZPIC told the Company that it had performed a post-payment review of claims for services provided from July 11, 2016, through September 21, 2017. JX 98 at 1. The Zone 4 ZPIC reported that twenty-six claims out of a sample of thirty-seven had errors, for an error rate of 68.8%. *Id.* Although the Company learned of this audit after the Second Zone 4 ZPIC Audit, the audit itself happened first. This decision therefore refers to it as the "First Zone 4 ZPIC Audit."

The Company retained the van Halem Group to respond to the audits and document requests, and to improve its claim submission process. The Company also consulted with Denise Leard, the Company's longtime CMS compliance counsel.

---

they did not regard a TPE as an "audit." *Id.* at 142–43; Newton Tr. 81. The Company's compliance counsel made clear that a TPE is an audit, albeit "the least worrisome" kind of audit. Leard Dep. 35.

On January 8, 2018, Leard sent a letter to Newton and Einwechter that summarized the TPE process and provided advice about the Second Zone 4 ZPIC Audit. On January 30, Leard sent a letter to Ferreira that summarized van Halem's findings about the Second Zone 4 ZPIC Audit. Leard reported that the Company's documentation was likely "not sufficient to justify payment in all cases." JX 139 at 4. Damning the Company with faint praise, she added that "the errors do not amount to fraud." *Id.* Leard advised the Company that it needed to lower its error rate to exit from the Second Zone 4 ZPIC Audit. Ferreira forwarded Leard's letter to Black.

Kim Sauber was a key employee for the audits. She was the Company's business analyst and oversaw its billing operations. On February 12, 2018, Sauber told Newton, Einwechter, and Eckberg that CMS contractors had conducted 193 reviews of claims relating to a range of the Company's products and that only fourteen were approved. Einwechter forwarded the email to Ferreira with the following comment:

> So they pick 193 claims and of this ONLY 14 were approved. That is scary with over 90% rejection. Sure the $'s were not large however if if [sic] was sitting on the purchaser side of this transaction the "perception" would clearly be I have revenue model out of control. I will craft email to Comvest tomorrow and try to avoid discussion of number of claims and only report on $'s.

JX 150 at 3. Referring to Comvest, Ferreira responded: "Not sure how we report this and not make these guys nervous." *Id.* at 2–3. Ferreira later added, "F*&k - I don't know how you even defend that!!" *Id.* at 2. He concluded, "Can't get this [deal] closed fast enough!!!" *Id.* at 1–2.

11

**F.  Comvest Learns About The Second Zone 4 ZPIC Audit.**

In early January 2018, Comvest learned about the Second Zone 4 ZPIC Audit. Comvest put the Initial LOI on hold to see how the ZPIC audit played out. Marrero described the deal as "now on life support given some recent diligence findings." JX 119. Later that month, Comvest learned that the Company also had "an ongoing audit in Zone 5." JX 131.

Because of the audits, Comvest sought additional information from the Company. Comvest learned that the Company's monthly cash collections declined from $1,454,000 in October 2017 to $862,000 in February 2018, then rebounded slightly to $947,000 in March 2018. Comvest attributed the decline to the distraction of the Second Zone 4 ZPIC Audit and the sale process. Comvest estimated that without those distractions, the Company would have generated approximately $150,000 more in collections per month.

Ferreira thought selling the Company would be a challenge. On April 1, 2018, he reminded Einwechter in an email that "21 banks looked at this deal and ALL turned it down. A variety of reason [sic] here but three main ones were the ever-increasing contractual allowance, the industry headwinds and the ZPIC audit." JX 231 at 1.

**G.      The Revised Letter of Intent**

Having learned about the CMS audits and identified a declining trend in collections, Comvest recalculated the Company's adjusted EBITDA for 2017, reducing it from $7.5 million to $4.3 million.

In April 2018, Comvest sent a revised letter of intent to the Company. It lowered the deal price to $30 million, with $18 million paid in cash at closing plus another $12 million taking the form of an unsecured subordinated promissory note that would be paid over six years.

Eckberg thought the lowered price was reasonable in light of the trend in collections and the audits. In an email to Newton, he noted that the Company was struggling to meet Medicare's requirements for submitting claims and that fixing the Company's problems would require overhauling its procedures, slowing down the submission rate, and spending 30% to 50% more to process claims. Eckberg told Newton, Ferreira, and Einwechter that without a sale to Comvest, it would take "at least a year (or probably more) to address issues that have been recently created and discovered." JX 230 at 2.

With the Company putting more upfront work into the quality of its claims, the rate of claim submission slowed precipitously from 2,507 in January to 217 claims in April 2018.[5] The average submission rate for February and March (1071 claims

---

[5] JX 240 at 1; *see* Tidd Tr. 556 (estimating the Company released about 50% of Medicare claims in January–February 2018 but about 10–20% in March–May 2018).

per month) was about a third of the average submission rate for October 2017 through January 2018 (3181 claims per month). As of May 30, 2018, the Company had a backlog of over 5,000 unsubmitted claims.

## H.     More Bad News For The Company

In April and May 2018, the Company received negative feedback from key customers. The Company's largest client by revenue was Stanford Health Care. On April 11, 2018, Stanford gave notice that the Company's contract would terminate in six months. Newton received a copy of the notice.

Baptist Health System was another of the Company's largest customers. That same month, Baptist Health System reduced the Company's coverage from five of its hospitals to four.

The Company also continued to struggle with the audits. In April 2018, a Zone 3 ZPIC started an inquiry and sent the Company document requests. Van Halem told the Company to expect follow-up requests because of the Company's high error rate. In May, the contractor leading the Zone 5 ZPIC audit told the Company that it had reviewed 220 claims and found errors in 214 of them for an error rate of 97%.

In emails between themselves, Ferreira and Einwechter candidly acknowledged the Company's problems and plummeting value. In a May 13, 2018 email exchange, Ferreira told Einwechter that "we are selling a house that is springing leaks every day." JX 283 at 1.

## I.     The Merger Agreement

On May 22, 2018, the Company entered into a merger agreement. *See* JX 312 (the "Merger Agreement"). Its counterparties were two newly created Comvest affiliates: an acquisition vehicle named Dura Medic Merger Sub, Inc. ("Merger Sub") and a holding company named Dura Medic Holdings, Inc. ("Holdings"). Holdings was a wholly owned subsidiary of another newly created entity, Dura Medic Parent Holdings, LLC ("Parent"), but Parent was not a party to the Merger Agreement.

Thirty-nine selling stockholders (the "Sellers") were parties to the Merger Agreement.[6] DM Seller Representative LLC, a newly created entity managed by Ferreira and Eckberg, served as the "Seller Representative."

Under the Merger Agreement, Merger Sub would merge with and into the Company, with the Company surviving as a wholly owned subsidiary of Holdings (the "Merger"). At closing, the selling stockholders' shares would be converted into the right to receive a total of $18 million in cash from Holdings, subject to potential

---

[6] The Sellers are Greg Bailey; Karen Lee Bryant; Gary Lee Campbell; Selle D'Shanna Campbell; Robert Chicoine; Crown Predator Holdings 1, LLC; James T. Doody; Grant Eckberg; Tim Einwechter; Jessica Evans; Deborah Fedorak; Rick Ferreira; Fisher Holdings LLC; G&D Progressive Services, Inc.; Kevin J. Harrington; Sherrie Horton; Becki Jaynes; KLBK Investments, LLC; Lewin Investments, LLC; Marc Mazur; Steven Mintz; Steve E. Nelson; Don Newton; Mark Newton; Stephen J. Nicholas, MD; George Shelton Ochsner; Stephen Ochsner; Jason Pauletto; Richard A. Danzig Profit Sharing Plan & Trust; Martin J. Rucidlo; Kim Sauber; Gavin Scotti; Morton Stayton; Steve E. Nelson Trust; Symcox Family Limited Partnership; Jay Symcox; Ellen Walsh; WIU Foundation; and Edward J. Zecchini.

15

adjustments. The selling stockholders also would share in a note issued by Holdings with a face value of $12 million (the "Seller Note").

The Merger Agreement called for the Company to make representations about its condition. Three are pertinent to this case.

First, the Company represented that its financial statements were "true, complete and accurate in all material respects and fairly present in all material respects the financial position of the Company" for calendar year 2017 and the last twelve months ("LTM") ending on April 30, 2018. The representation stated that the Company used a Gross-to-Net Ratio of 25.7% in the financial statements. JX 312 § 4.5(a), (b), (e); JX 313 Schedule 4.5(a) (collectively, the "Financial Statements Representation").

Second, the Company represented that it had complied in all material respects with all laws, including healthcare laws, during the three years before the Merger, except as stated in a disclosure schedule. JX 312 §§ 4.7(a), 4.8(a); JX 313 Schedule 4.8 (collectively, the "Law Compliance Representation"). The disclosure schedule identified the Second Zone 4 ZPIC Audit. It did not identify the First Zone 4 ZPIC Audit, the TPE audit, or the 2017 RAC Audit. *See* JX 313 Schedule 4.8.

Third, the Company represented that no counterparty to a material contract had notified the Company that it intended to terminate or restrict its contract during the twelve months before closing. JX 312 § 4.23; JX 313 Schedule 4.23 (together, the "Counterparty Representation"). The Company identified Stanford Health Care and Baptist Health System as counterparties to material contracts, but did not identify

16

them as having sought to terminate or restrict their agreements with the Company. *See* JX 313 Schedule 4.23.

The indemnification provisions in the Merger Agreement entitled Comvest to recover any losses that resulted from inaccurate representations. JX 312 § 9.1(a). The Merger Agreement defined "Losses" to include "any and all damages," including "damages based on a multiple of earnings, revenue or other metric." *Id.* § 9.1(c).

The Merger Agreement provided that the Sellers would only be liable to Comvest for indemnification if Comvest's losses exceeded $300,000. *Id.* § 9.4(c). That deductible did not apply to breaches of "Fundamental Representations," which included the representations regarding the Company's financial statements and law compliance. *Id.*; *id.* § 9.4(b) (listing, among others, §§ 4.5(a), 4.5(e), 4.8).

The Merger Agreement stated that if Comvest claimed losses based on a multiple of earnings, then the Sellers would only be liable to Comvest for indemnification if Comvest's losses exceeded $1.5 million. Once that limit was reached, then Comvest could recover all of its losses starting with dollar one. *Id.* § 9.1(c). Comvest also could offset any indemnifiable losses against the amount due under the Seller Note. *Id.* § 9.5. Offset was optional, not required.

The Merger closed June 6, 2018. That day, Holdings delivered the Seller Note to the Seller Representative.

After the Merger, Parent owned 100% of Holdings, which owned 100% of the Company. A Comvest affiliate owned 63.6% of Parent's units. Other investors, including Black, his friends and family, and Tidd, owned 26.7% of Parent's units.

17

Newton rolled over $1 million of his proceeds from the Merger and received Parent units.

The investors in Parent were structurally subordinated to the Seller Note, which Holdings had issued. The Seller Note in turn was structurally subordinated to any debt at the Company level.

After the Merger, Comvest controlled the boards of Parent, Holdings, and the Company. Each entity's governing board had the same five members: Marrero, Chawla, Callahan, and Stacie Brachter, plus Black as the Company's CEO. Tidd became the Company's COO.

## J. The Bad News Continues.

Even before the Merger closed, Black and Tidd decided to withhold all Medicare claims until the Company improved its submission process. After the Merger, they implemented that decision but continued to submit claims to third-party payors and private insurers.

On June 8, 2018, two days after closing, Black learned about the ongoing TPE audit. Two weeks later, the TPE Reviewer reported that the Company had reduced its error rate from 80% to 41.85%, but that still required a third round of review. If the Company failed the third round, then it could lose its ability to submit claims to Medicare. A sanction of that magnitude was unlikely but possible.

On June 21, 2018, Black emailed the Seller Representative about the TPE audit. Black was blunt: "The ramifications of a failed round three are not only serious, but also potentially threatening to the continuance of Dura Medic's business, whereby

failure could mean everything from an extrapolation and fine to revoking Dura Medic's Medicare provider number." JX 381. He continued: "We are doing everything in our power to ensure clean claims are going out the door to be process [sic] and paid, and in the interim, holding all claims until thoroughly reviewed. This will put a serious burden on our cash flow, but for the long-term good (and compliance) of the business, this is what needs to be done." *Id*.

Ferreira and Einwechter thought they had dodged a bullet by selling the Company. Ferreira emailed Einwechter, asking, "Remember the game 'pass the parcel'????" *Id*. Einwechter responded by describing the deal as "[t]he all-time escape job." *Id.*

Meanwhile, the Company learned that it was the subject of additional audits. A new Zone 7 ZPIC audit started one day before closing. PTO ¶ 86. There was also a RAC audit that resulted in demands for reimbursement of noncompliant claims. By October 2019, the Company had received over 100 recoupment demands for the pre-Merger period from 2016 to 2018. The total claims amounted to several hundred thousand dollars of reimbursements.

## K. This Litigation

After taking over the Company, Comvest concluded that its claims processes and financial performance were sufficiently poor to support claims against the Sellers. By February 2019, Comvest had retained litigation counsel. On March 28, 2019, Comvest's counsel delivered a claim notice to the Seller Representative that demanded $16,585,605 in indemnification.

19

On June 21, 2019, Comvest caused the Company and Holdings (together, the "Buyers") to sue the Seller Representative and each of the Sellers individually (the "Contract Action"). In the Contract Action, the Buyers sought indemnification for breaches of representations in the Merger Agreement.

On August 27, 2019, the Seller Representative asserted counterclaims and third-party claims in the Contract Action. The Seller Representative contended that Holdings breached the Seller Note through non-payment. The court granted summary judgment in the Seller Representative's favor for breach of the Seller Note.

The Seller Representative also contended that the Buyers breached the Merger Agreement by intentionally withholding Medicare claims to sabotage the Company's short-term revenues, maximize Comvest's indemnification claims, and deprive Holdings of distributions that could be used to pay the Seller Note.

Trial lasted five days. The parties introduced 1288 exhibits and deposition transcripts from nineteen individuals. Eleven fact witnesses and three expert witnesses testified live.

## II. LEGAL ANALYSIS

The Buyers seek indemnification for breaches of three categories of representations in the Merger Agreement: the Financial Statements Representation, the Law Compliance Representation, and the Counterparty Representation.[7] The

---

[7] The Buyers' complaint alleged other breaches. After trial, the Buyers helpfully narrowed their claims to those three categories. Dkt. 368 (Comvest Parties' Opening Post-Trial Brief) at 72.

Seller Representative counterclaims for breach of the implied covenant of good faith and fair dealing in the Merger Agreement.

Each of those claims asserts a breach of contract. Under Delaware law, the elements of that claim are "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[8] No one disputes that the Merger Agreement is a binding obligation. No one disputes that money is the appropriate remedy. The only issues are determining the scope of the obligation, assessing breach, and quantifying the amount of damages.

## A. Applicable Principles of Contract Law

When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent."[9] The "parties' intent" is a term of art. Rather than referring to what the parties subjectively believed, it refers to the parties' shared intent as "would be understood by an objective, reasonable third party."[10]

If the contractual language is clear, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement

---

[8] *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[9] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[10] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).

as a whole and giving effect to all its provisions."[11] "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[12] A writing is clear "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation."[13]

By contrast, if a writing is ambiguous, then a court must look to other sources to determine what any objectively reasonable third party would have understood the parties' intent to be.[14] "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[15] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[16] Nor is a contract unambiguous simply because both sides contend that its meaning is plain.[17]

---

[11] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[12] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[13] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

[14] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007).

[15] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[16] *Id.*

[17] *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68. (Del. 2019).

The parties do not agree on the proper construction of several provisions of the Merger Agreement. But the contract is nonetheless unambiguous. The parties' contract claims turn on the plain, common, and ordinary meaning of the words in each provision.

## B.     The Financial Statements Representation

The Buyers contend that the Sellers breached the Financial Statements Representation. The Buyers failed to prove breach.

The Financial Statements Representation initially states:

> The Company has furnished to Purchaser (i) the annual consolidated balance sheet of the Company at December 31, 2015, 2016, and 2017 and the related consolidated statements of (A) income (including any Net Revenue Adjustments related thereto) for the fiscal years then ended, and (B) cash flows for the (1) twelve (12) month period ended December 31, 2017, and (2) four (4) month period ended April 30, 2018, and (ii) the interim consolidated balance sheet of the Company at each of January 31, 2018, February 28, 2018, March 31, 2018, and April 30, 2018 (the latter of which is referred to herein as the "Recent Balance Sheet") and the related consolidated statements of income (including any Net Revenue Adjustments related thereto), for the twelve (12) month period ended April 30, 2018 (the financial statements referenced in clauses (i) and (ii) are collectively referred to as the "Financial Statements"), copies of which are attached hereto as Schedule 4.5(a), and in the case of the Financial Statements for fiscal year 2017 and for the twelve (12) month period ended April 30, 2018 are presented on a monthly basis.

JX 312 § 4.5(a). Subsequent subsections make representations about the Financial Statements.

In Section 4.5(e), the Company made representations about its Gross-to-Net Cash Conversion Ratio (or Gross-to-Net Ratio) and its EBITDA. It stated:

> *The Net [Patient] Revenue* (as such term is used in the Financial Statements) of the Company for each of the (i) twelve (12) month period

ended December 31, 2017, and (ii) twelve (12) month period ended April 30, 2018 *is based upon the Financial Statements* (attached hereto as Schedule 4.5(a)), including for each such measurement period the aggregate Patient Revenue (as such term is identified as 4001 in the Financial Statements) of the Company *and the Gross-to-Net Cash Conversion Ratio* (as such term is used in the Financial Statements) of the Company *of 25.7%*, in each case, inclusive of the Net Revenue Adjustment for such period.

*Id.* § 4.5(e) (emphasis added). In simplified form, Section 4.5(e) represented that the Net Patient Revenue calculation that appeared in the Financial Statements was based on two things: (i) the Financial Statements and (ii) a Gross-to-Net Ratio of 25.7%.

At trial, the Buyers demonstrated that the Company's Gross-to-Net Ratio for LTM April 2018 was 22.5%, not 25.7%.[18] The Buyers contend that because the Company's actual Gross-to-Net Ratio was 3.2% lower than the Gross-to-Net Ratio specified in Section 4.5(e), the Sellers breached that representation.

That argument fails. The Financial Statements Representation did not represent that the Company's actual Gross-to-Net Ratio was 25.7%. The representation explained how the Sellers calculated Net Patient Revenue, not what the actual collections would be. If the Buyers had worked backwards from Net Patient

---

[18] To reach this figure, the Buyers demonstrated that the Company's actual Net Patient Revenue for LTM April 2018 was $12,750,675, compared to the $14,521,945 figure in the Financial Statements. Using the actual figure, the Buyers calculated the Company's actual Gross-to-Net Ratio. JX 1155 at 9. For purposes of liability, the Sellers agree that the Company's actual Gross-to-Net Ratio differed from the figure of 25.7% in Section 4.5(e). *See* Dkt. 385 (Sellers' Post-Trial Reply/Answering Brief) at 52–55.

Revenue to solve for the Gross-to-Net Ratio, and if that exercise revealed a Gross-to-Net Ratio different than 25.7%, then the representation would have been breached. The Company did not make a forward-looking representation about what its actual Gross-to-Net Ratio would be. The Buyers therefore failed to prove a breach of Section 4.5(e).

Along similar lines, the Buyers contend that the Company breached Section 4.5(b). It stated:

> The Financial Statements are true, complete and accurate in all material respects and fairly present in all material respects the financial position of the Company and its Subsidiaries at the indicated dates and the results of operations for the indicated periods, and have been prepared in accordance with GAAP consistently applied, except that the Financial Statements do not contain footnotes and the interim financial statements may be subject to normal year-end adjustments (the effect of which will not, individually or in the aggregate, be material in amount or effect). The Financial Statements were compiled from and are in accordance with the books and records of the Company and its Subsidiaries, which in turn are true, correct, and complete in all material respects.

JX 312 § 4.5(b).

According to the Buyers, because the Company's actual Gross-to-Net Ratio turned out to be 22.5%, rather than the 25.7% used to calculate Net Patient Revenue, the Company's Financial Statements were not "true, complete and accurate in all material respects" and did not "fairly present in all material respects the financial position of the Company and its Subsidiaries at the indicated dates and the results of operations for the indicated periods."

Again, the Buyers miss the mark. The Gross-to-Net Ratio in the Financial Statements depended on a forward-looking estimate of collections. The actual figure

25

would depend on the Company's success in collecting accounts receivable. The collection rate varied because payors often delayed payment or rejected claims.

Because the Gross-to-Net Ratio was a forward-looking estimate, the representation was truthful and accurate as long as it reflected the Sellers' actual, good-faith belief about what the future collections would be.[19] The Buyers failed to prove that the collections estimate did not represent the Sellers' good-faith belief.

The Buyers could have bargained for a warranty that the actual level of collections would result in a Gross-to-Net Ratio of 25.7%. Justice Holmes explained the relevant concepts a century ago:

> An assurance that it shall rain to-morrow, or that a third person shall paint a picture, may as well be a promise as one that the promisee shall receive from some source one hundred bales of cotton, or that the promisor will pay the promisee one hundred dollars. What is the difference in the cases? It is only in the degree of power possessed by the promisor over the event. He has none in the first case. He has equally little legal authority to make a man paint a picture, although he may have larger means of persuasion. He probably will be able to make sure that the promisee has the cotton. Being a rich man, he is certain to be able to pay the one hundred dollars, except in the event of some most improbable accident.
>
> But the law does not inquire, as a general thing, how far the accomplishment of an assurance touching the future is within the power of the promisor. In the moral world it may be that the obligation of a promise is confined to what lies within reach of the will of the promisor

---

[19] *See* Steffen Tr. 1159–61; JX 1160 at 10–11; Bouchner Tr. 1315 ("Q: Right. So the use of the past tense is wrong, isn't it? A: Again, I don't think I was using it as past tense in that it was in the past. I was saying that's what it was in the document."); *id.* ("Q: Right. There's a number in the document that is a future-looking estimate. Right? A: Yes."); Dkt. 385 at 53 ("[Section 4.5(e)] is not a representation by the Sellers of *what* those collections *would later turn out to be*.") (second emphasis added)).

(except so far as the limit is unknown on one side, and misrepresented on the other). But unless some consideration of public policy intervenes, I take it that a man may bind himself at law that any future event shall happen. He can therefore promise it in a legal sense. It may be said that when a man covenants that it shall rain to-morrow, or that A shall paint a picture, he only says, in a short form, I will pay if it does not rain, or if A does not paint a picture. But that is not necessarily so. A promise could easily be framed which would be broken by the happening of fair weather, or by A not painting. A promise, then, is simply an accepted assurance that a certain event or state of things shall come to pass.[20]

Just as the Buyers could have insisted on a warranty about the weather, they also could have insisted on a warranty that the Company's actual Gross-To-Net Ratio would be 25.7%. They did not secure it. The Buyers therefore failed to prove that the Sellers breached the representation in Section 4.5(b).

## C.     The Counterparty Representation

The Buyers next contend that the Sellers breached the Counterparty Representation by failing to disclose that two significant customers intended to terminate or limit their relationship with the Company. The Buyers proved that the Company breached the Counterparty Representation.

Titled "Significant Third Party Payors, Significant Customers, and Significant Suppliers," Section 4.23 of the Merger Agreement provides as follows:

No Significant Third Party Payor, Significant Customer, or Significant Supplier has given notice to the Company that it intends to terminate, limit, or negatively alter its business relationship (including with respect to pricing or volume) with the Company or its Subsidiaries.

---

[20] Oliver Wendell Holmes, Jr., *The Common Law* 298–99 (1881) (footnotes omitted).

27

There are no outstanding disputes with any of the Significant Third Party Payors, Significant Customers, or Significant Suppliers.

JX 312 § 4.23. The same section defines "Significant Customers" as "the ten (10) largest Customers of the Company and the Subsidiaries, in the aggregate (in terms of revenue to the Company and the Subsidiaries) during (i) the twelve (12) month period ended December 31, 2017, and (ii) the four (4) month period ended April 30, 2018." *Id.* Schedule 4.23 lists the Company's Significant Customers and includes Stanford Health Care and Baptist Health System. JX 313 Schedule 4.23.

The Buyers proved that Stanford notified the Company that it intended to end its customer relationship. On April 11, 2018, the Company's account representative for Stanford, Marianne Hidalgo, emailed Stephen Ochsner, the pre-Merger vice president of operations who stayed on after the Merger. Hidalgo reported that, according to Stanford representative Jonathan Chang, Dura Medic would be exiting in the next six months. JX 247; Ochsner Tr. 715–16. Ochsner was concerned about losing the account. Ochsner Tr. 741. He forwarded that email to Newton and scheduled a call with him the next morning. JX 247.

The Sellers did not identify Stanford as an exception to the representation. Shortly after the Merger, Stanford terminated its relationship with the Company. Black Tr. 247–48.

Those facts establish a straightforward breach of the Counterparty Representation. In response, the Sellers argue that customers sent emails like that all the time, that the email simply reported on a rumor, and that the Company regularly succeeded in convincing jumpy clients to remain with the Company. But

28

the Counterparty Representation did not contain language conditioning the representation on those factors. The representation called for identifying whether a Significant Customer had given notice to the Company that it would terminate or limit its contract. That is what happened here.

The Buyers also proved that Baptist Health System, another Significant Customer, sought to limit its relationship with the Company. Before the execution of the Merger Agreement, Baptist Health System informed the Company that one of its five hospitals would no longer participate in its services agreement with the Company. JX 235 at 1; JX 237. The amendment to the services agreement became effective April 20, 2018, about six weeks before the Merger closed. JX 235 at 1; JX 237.

This too is a straightforward breach of the Counterparty Representation. In response, the Sellers argue that the one hospital was not a Significant Customer. But Baptist Health System was. Reducing the number of participating hospitals by one constituted a limitation of its contract with the Company. The Counterparty Representation called for disclosure.

The Sellers also argue that Baptist Health System's decision helped the Company because that hospital was the "[l]owest performing facility in the system and [had] low profitability." Dkt. 385 at 57. The Counterparty Representation does not turn on the performance or profitability of the relationship. It turns on notice.

If the Sellers had disclosed the notifications received from Stanford and Baptist Health System to the Buyers, then a discussion could have ensued. Perhaps the

Sellers would have convinced the Buyers that the changes were immaterial. Instead, the Sellers represented that "[n]o . . . Significant Customer . . . has given notice to the Company that it intends to terminate, limit, or negatively alter its business relationship (including with respect to pricing or volume) with the Company." JX 312 § 4.23. That representation was false. The Buyers are entitled to indemnification for losses related to that breach.

**D.     The Law Compliance Representation**

The Buyers last contend that the Sellers breached the Law Compliance Representation by failing to identify past or pending audits. The Buyers proved a breach here as well.

The Law Compliance Representation initially states:

> The Company and its Subsidiaries, and their respective predecessors and Affiliates, have since January 1, 2015 complied in all material respects with, and are in compliance in all material respects with, all applicable Laws and Orders, and no Proceeding has been filed or commenced or, to the Knowledge of the Company and the Sellers, threatened alleging any failure so to comply.

*Id.* § 4.7(a).

Later, the Law Compliance Representation includes a more specific representation about compliance with healthcare laws:

> Except as disclosed on <u>Schedule 4.8</u>, the Company and its Subsidiaries are, and have been in the past three (3) years, in material compliance with all applicable Health Care Laws. Neither Company nor any Subsidiary of the Company has received written notice in the past three (3) years from any Governmental Authority of any threatened or pending legal, administrative, enforcement or other Proceeding against or affecting the Business alleging any material failure to comply with Healthcare Laws.

*Id.* § 4.8(a). Under these provisions, the Company had to disclose any CMS audits on the associated Schedule 4.8.

Schedule 4.8 contained the following information:

On June 1, 2017, the Company received correspondence from the Zone Program Integrity Contractor (ZPIC) – Zone 4, notifying the Company that Health Integrity would be conducting a review of selected claims the Company had submitted to Medicare and/or Medicaid. On December 7, 2017, the Company received further correspondence notifying the Company that Health Integrity would be initiating prepayment medical review of the Company's claims, effective December 12, 2017 (the review process and related matters are collectively referred to as the "ZPIC Audit"). As of the date hereof, the ZPIC Audit is ongoing.

JX 313 Schedule 4.8.

Schedule 4.8 thus disclosed the Second Zone 4 ZPIC Audit. Schedule 4.8 did not identify other audits.

### 1. The TPE Audit

The Buyers proved at trial that for the Law Compliance Representation to be accurate, the Sellers needed to disclose the TPE audit. The Sellers respond that they informed the Buyers about the TPE audit during a conference call in February 2018. Dkt. 385 at 17. The Sellers also contend that the TPE audit is not material.

For purposes of the contractual representation in the Merger Agreement, whether the Sellers disclosed the TPE audit to the Buyers outside the Merger Agreement has no bearing on the legal analysis. While serving as a Vice Chancellor, Chief Justice Strine addressed whether a buyer who had reason to be concerned about the accuracy of a representation and had the ability to conduct due diligence to confirm its accuracy could nevertheless claim to have relied on the representation for

purposes of a breach of contract claim.[21] The seller argued that the buyer did not in fact rely on the representation in that setting and waived its claim for breach. The Chief Justice rejected this argument:

> [A] breach of contract claim is not dependent on a showing of justifiable reliance. That is for a good reason. Due diligence is expensive and parties to contracts in the mergers and acquisitions arena often negotiate for contractual representations that minimize a buyer's need to verify every minute aspect of a seller's business. In other words, representations like the ones made in [the agreement] serve an important risk allocation function. By obtaining the representations it did, [the buyer] placed the risk that [the seller's] financial statements were false and that [the seller] was operating in an illegal manner on [the seller]. Its need then, as a practical business matter, to independently verify those things was lessened because it had the assurance of legal recourse against [the seller] in the event the representations turned out to be false. . . .
>
> [H]aving given the representations it gave, [the seller] cannot now be heard to claim that it need not be held to them because [the buyer's] due diligence did not uncover their falsity. . . . Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words.[22]

Other Delaware decisions reach the same conclusion.[23]

---

[21] *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926 (Del. Ch. July 20, 2007), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE).

[22] *Id.* at *28 (footnotes omitted).

[23] *See Gloucester Hldg. Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 127–28 (Del. Ch. 2003) ("Reliance is not an element of a claim for indemnification" for "breach of any of the representations or warranties in [the agreement] . . . ."); *id.* at 127 (rejecting contention that justifiable reliance was an element of breach of contract as "simply incorrect"); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005) ("No such reasonable reliance is required to make a *prima facie* claim for breach."), *aff'd*, 886 A.2d 1278 (Del. 2005) (TABLE). *See generally* Victor P. Goldberg, *Protecting Reliance*, 114 Colum. L. Rev. 1033, 1080 (2014) ("The

The Delaware cases comport with how a leading treatise describes the intersection between the due diligence process and representations in a merger agreement. As the treatise explains,

> a party may well ask for a specific representation and warranty on a certain topic because its investigation of the business being acquired has convinced it that such topic is particularly important to that business or

---

weight of authority, and practice, is with the pro-sandbagging side."). Commentators often use the term "sandbagging" to refer to the practice of asserting a claim based on a representation despite having had reason to suspect it was inaccurate. *See, e.g.*, Charles K. Whitehead, *Sandbagging: Default Rules and Acquisition Agreements*, 36 Del. J. Corp. L. 1081, 1087, 1092–93 (2011) (surveying jurisdictions and acquisition agreements; concluding that New York and Delaware are pro-sandbagging and that very few acquisition agreements have anti-sandbagging clauses). This is a loaded and pejorative term: It "originates from the 19th century where gang members would fill socks full of sand to use as weapons against unsuspecting opponents. While at first glance, the socks were seemingly harmless, when used to their full potential they became very effective and would inflict substantial damage on a 'sandbagged' victim." Stacy A. Shadden, *How to Sandbag Your Opponent in the Unsuspecting World of High Stakes Acquisitions*, 47 Creighton L. Rev. 459, 459 (2014) (footnote omitted). From my perspective, the real question is whether the risk allocation in the contract controls, or whether a more amorphous and tort-like concept of assumption of risk applies. To my mind, the latter risks having cases routinely devolve into fact disputes over what was provided or could have been provided in due diligence. The former seems more in keeping with Delaware's contractarian regime, particularly in light of Delaware's willingness to allow parties to restrict themselves to the representations and warranties made in a written agreement. *See ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *4–7 (Del. Ch. July 31, 2018); *Novipax Hldgs. LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *10–13 (Del. Super. Nov. 28, 2017); *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *4–8 (Del. Ch. Nov. 30, 2016); *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50–51 (Del. Ch. 2015); *Anvil Hldg. Corp. v. Iron Acq. Co., Inc.*, 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013); *ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1035–36, 1051–64 (Del. Ch. 2006); *Homan v. Turoczy*, 2005 WL 2000756, at *17 & n.53 (Del. Ch. Aug. 12, 2005) (Strine, V.C.); *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 & n.18 (Del. Ch. 2003); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del. Ch. 2001). *See generally* Steven M. Haas, *Contracting Around Fraud Under Delaware Law*, 10 Del. L. Rev. 49 (2008).

has made it aware of a specific problem or concern as to which it wants the added comfort of a specific representation.[24]

Rather than constituting some form of waiver, a buyer's knowledge about an issue shapes the representations that it bargains for:

Suppose the Buyer requests the Seller to represent that the Company being sold is not in material breach of any material contracts. The Company may in fact be in violation of three material agreements, two of which violations the Seller is sure are material and one of which it believes to probably be immaterial. What does the Seller do? It modifies the representation to state: "Except as set forth on the Disclosure Schedule, the Company is not in material breach of any material agreement." The referenced schedule will then list the two, or possibly all three, of the agreements in question.[25]

From the seller's perspective, the representation is now true.[26] But if the parties do not qualify the representation, then the party making the representation assumes the risk for a deviation.

The integration clause in the Merger Agreement also forecloses the Sellers' argument that the Buyers' pre-signing knowledge of an audit modified the terms of the Merger Agreement. The integration clause states:

Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and the other Transaction Documents constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, and no Party shall be liable or bound to the

---

[24] Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 1.06, at 1-43 (2024 ed.).

[25] *Id.* § 10.02, at 10-3.

[26] *See id.*

34

other in any manner by any representations or warranties not set forth herein.

JX 312 § 11.3. While a standard integration clause alone will not bar a fraud claim,[27] a standard integration clause does bar the admission of extrinsic evidence "for the purpose of varying or contradicting the terms of that contract."[28] The Sellers cannot alter the Law Compliance Representation by pointing to information the Buyers allegedly learned in due diligence.

---

[27] To bar a fraudulent inducement claim, an agreement must also contain explicit anti-reliance language. *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) ("Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."); *ABRY P'rs*, 891 A.2d at 1059 ("[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."); *Airborne Health, Inc. v. Squid Soap* (*Squid Soap I*), 984 A.2d 126, 141 (Del. Ch. 2009) ("An anti-reliance provision must be explicit, and a standard integration clause is not enough."). The Buyers do not allege they were fraudulently induced to enter into the Merger Agreement.

[28] *Phillips v. Wilks, Lukoff & Bracegirdle, LLC,* 2014 WL 4930693, at *3 (Del. Oct. 1, 2014) (ORDER); *accord TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at 4 (Del. Super. Sept. 25, 2015); *see also Taylor v. Jones,* 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002) (describing the parole evidence rule as "a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing").

Regardless, the trial record does not support the Sellers' contention that they disclosed the TPE audit. The Sellers point to a conference call on February 28, 2018, where the topics included regulatory compliance. Newton Tr. 38–41; PTO ¶ 80; JX 181. Newton testified that the participants discussed the TPE audit. Another witness "believe[d]" that the participants discussed the TPE audit but could not remember any specifics. Leard Dep. 52–53 ("It was a long time ago."). The subject line in the conference call invitation read "Dura Medic ZPIC update call." JX 181. The subject line did not mention the TPE audit. Most important, shortly after the call, Einwechter circulated an internal email that stated, "They never asked about the October audit— so we didn't bring it up since this data is in the data room."[29] A Comvest employee testified that he performed targeted searches for audit-related materials in the data room and did not find the TPE audit. Carroll Dep. 314–15, 319. Black and Tidd testified credibly that they learned about the TPE audit after the Merger closed. Black Tr. 238; Tidd Tr. 444. Other Comvest internal documents corroborate that testimony.[30] Having weighed the evidence, this decision finds that the Sellers did not disclose the TPE audit before the Merger closed.

The Sellers also argue that the TPE audit was not material. When used to qualify a representation, the adjective "material" "seeks to exclude small, *de minimis*,

---

[29] JX 186. The reference to the October audit means the TPE audit. The first round of the audit ended in October 2018. JX 49 at 1.

[30] *See* JX 442 at 2, 5; JX 557 at 1–2; JX 381.

and nitpicky issues that should not derail an acquisition."[31] For the breach of a representation to be material, there need only be a "substantial likelihood that the . . . fact [of breach] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information."[32] That interpretation "strives to limit [a contract term with a materiality qualifier] to issues that are significant in the context of the parties' contract, even if the breaches are not severe enough to excuse a counterparty's performance under a common law analysis."[33]

In Section 4.8(a), the Sellers represented that during the previous three years, "[n]either [the] Company nor any Subsidiary of the Company has received written notice . . . from any Governmental Authority of any threatened or pending

---

[31] *Akorn, Inc. v. Frensenius Kabi AG*, 2018 WL 4719347, at *85 (Del. Ch. Oct. 1, 2018).

[32] *Id.* at *86.

[33] *Id.*; *accord Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021) ("Put differently, the materiality standard at issue asks whether the business deviation significantly alters the buyer's belief as to the business attributes of the company it is purchasing."); *see Williams Cos., Inc. v. Energy Transfer LP*, 2021 WL 6136723, at *25–26 (Del. Ch. Dec. 29, 2021) (applying *Akorn* meaning of "in all material respects" qualifier to a covenant in a merger agreement); *AB Stable*, 2020 WL 7024929, at *73 (same); *Snow Phipps*, 2021 WL 1714202, at *38 (same); *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *26–29 (Del. Ch. Aug. 10, 2020) (applying *Akorn* meaning of "in all material respects" qualifier to a representation in a merger agreement); *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *17 (Del. Ch. Dec. 18, 2019) (same); *see also In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *134 n.426 (Del. Ch. Aug. 31, 2020) (distinguishing common law "material breach" standard from "in all material respects" standard), *aff'd sub nom. Cigna Corp. v. Anthem, Inc.*, 251 A.3d 1015 (Del. 2021) (TABLE).

37

administrative, enforcement, or other Proceeding against or affecting the Business alleging any material failure to comply with Healthcare Laws." JX 312 § 4.8(a). Section 1.1 of the Merger Agreement defines "Governmental Authority" to include "any governmental . . . agency . . . or agent thereof." It defines "Proceeding" to include "any . . . audit" and "Health Care Laws" to include "any and all federal . . . regulations." *Id.* § 1.1.

On November 14, 2017, the Company received written notice from the TPE Reviewer about a TPE review. The TPE Reviewer is an agent of CMS, which is a federal agency. A TPE review is a type of audit. JX 102 at 1.

The existence of the TPE audit was material. In the first round of the TPE audit, the TPE Reviewer reviewed a thirty-claim sample and identified twenty-four claims that failed to comply with various Medicare regulations, establishing a "failure to comply with Healthcare Laws." JX 312 § 4.8(a). A TPE audit can lead to the revocation of a supplier's Medicare provider number, a referral to the Office of Inspector General, or other enforcement actions.[34] The Buyers' regulatory expert also testified about the seriousness of a TPE audit. Shickle Tr. 1139.

It was substantially likely that the existence of the TPE audit "would have been viewed by the reasonable investor as having significantly altered the 'total mix'

---

[34] Leard Dep. 33–34. Leard regards TPEs as "very serious." *Id*. at 34.

of information."[35] By failing to include the TPE audit on Schedule 4.8, the Sellers breached the Law Compliance Representation.

### 2. The First Zone 4 ZPIC Audit

The Buyers proved at trial that for the Law Compliance Representation to be accurate, the Sellers needed to disclose the First Zone 4 ZPIC Audit. The Sellers contend that the First Zone 4 ZPIC Audit was not material, but the Buyers proved otherwise.

A ZPIC audit is more worrisome than a TPE audit. *See* Leard Dep. 35, 99. Because the TPE audit was material, so was the First Zone 4 ZPIC Audit. The Sellers' decision to disclose the Second Zone 4 ZPIC Audit shows that the Sellers understood that ZPIC audits were material.[36]

The First Zone 4 ZPIC Audit was plainly material in its own right. In a letter dated January 5, 2018, the Zone 4 ZPIC reported examining a time period from July 11, 2016, to September 21, 2017, and rejecting twenty-six of the thirty-seven claims it reviewed, resulting in an error rate of 68.8%. JX 98 at 1. The length of the audit period and the high error rate indicated a large audit that the Company needed to

---

[35] *Akorn*, 2018 WL 4719347, at *86.

[36] *See Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *1 (Del. Ch. Aug. 31, 2021) ("Plaintiffs have identified a discussion between Caruso and the acquiror's representative that was not disclosed in the Proxy, even though the Proxy discloses other, similar communications between them regarding the Merger price. It is reasonably conceivable that this omission was material in light of the related disclosures.").

take seriously. The Buyers proved at trial that the Sellers breached the Law Compliance Representation by failing to disclose the First Zone 4 ZPIC Audit.

### 3. The 2017 RAC Audit

The Buyers proved at trial that for the Law Compliance Representation to be accurate, the Sellers needed to disclose the 2017 RAC Audit. The Sellers respond that the 2017 RAC Audit was not material.

The same reasoning that governs the TPE audit and the First Zone 4 ZPIC Audit holds for the 2017 RAC Audit. A rational buyer would want to know that a CMS contractor charged with seeking recoupment of improperly paid claims subjected the Company to an audit for services billed in 2016 and 2017. In addition to seeking recoupment, a RAC auditor can refer a company to the Office of Inspector General or CMS for legal action. Leard Dep. 34–35. Tidd testified that the Company faced recoupment demands after the Merger closed. Tidd Tr. 457, 485–86, 487–88. The Buyers were entitled to know about the 2017 RAC Audit and to assess the risk for themselves.

The Buyers proved that by failing to disclose the 2017 RAC Audit on Schedule 4.8, the Sellers breached the Law Compliance Representation.

### E. Damages For The Proven Breaches

The Buyers had the burden of proving an amount of damages that flowed from the breaches of the Merger Agreement.[37] As a general matter, a remedy for breach of

---

[37] *OptimisCorp. v. Waite*, 2015 WL 5147038, at \*55 (Del. Ch. Aug. 26, 2015).

contract should seek to give the non-breaching party the benefit of its bargain.[38] "In Delaware, the traditional method of computing damages for a breach of contract claim is to determine the reasonable expectations of the parties."[39]

In addition to showing the existence of damages, the plaintiff must show "that the damages flowed from the defendant's violation of the contract."[40] The court evaluates but-for causation by considering "how the positions of the parties would differ in the 'but-for' world—*i.e.*, the hypothetical world that would exist if the [a]greement had been fully performed."[41] The court evaluates proximate causation by considering "how close the relationship is between the causal factor and the resulting damages. If the causal factor is too attenuated, then a court can decline to award damages because of a lack of proximate cause."[42]

Where parties have agreed on a particular remedy, Delaware law prioritizes their agreement. The parties' agreement on a remedy is sufficient, standing alone, to

---

[38] *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000).

[39] *Cobalt*, 2007 WL 2142926, at *29.

[40] *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *16 (Del. Ch. May 29, 2015) (internal quotation mark omitted).

[41] *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *43 (Del. Ch. Sept. 30, 2013).

[42] *Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2023 WL 4560984, at *22 (Del. Ch. July 14, 2023), *aff'd sub nom. McLaren v. Smash Franchise P'rs, LLC*, 319 A.3d 909 (Del. 2024).

award it.[43] Requiring parties to live with "the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length."[44]

That said, a contractual remedy does not bind the court, and the court has discretion to award a different remedy. "[E]ven if a contract specifies a remedy for breach of that contract, 'a contractual remedy cannot be read as exclusive of all other remedies [if] it lacks the requisite expression of exclusivity.'"[45]

### 1.    The Contractual Indemnification Regime

The Merger Agreement provides for indemnification as a remedy for breaches of representations. The Merger Agreement states:

> Subject to the limitations in <u>Section 9.4</u>, each Seller, severally and not jointly (except with respect to any claims which may be set off against the Seller Note), based on its respective Pro Rata Share, agrees to indemnify and hold harmless [Holdings], the [Company], and their respective Subsidiaries directors, officers, employees, equity owners, members, managers, successors, assigns, controlling Persons, Affiliates representatives and agents (collectively, the "<u>Purchaser Indemnitees</u>"), from, against and in respect of all Losses incurred or required to be paid by any of them by reason of: (i) any misrepresentation, breach or

---

[43] *See Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (specific performance); *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) (injunctive relief); *Dover Assocs. Joint Venture v. Ingram*, 768 A.2d 971, 974 (Del. Ch. 2000) (receiver).

[44] *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).

[45] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002) (second alteration in original) (quoting *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 214 (Del. 1975)).

inaccuracy of any representation or warranty made by the Company in Article IV of this Agreement or in any Transaction Document[.]

JX 312 § 9.1(a)(1). The Merger Agreement defines "Losses" as "any and all damages . . . including any amounts paid in settlement in accordance with this Article IX or any damages based on a multiple of earnings, revenue or other metric." *Id.* § 9.1(c). If the Buyers seek Losses based on a multiple of earnings, revenue, or other metric, then "no amount shall be payable by the Sellers until the aggregate amount of such Losses exceeds $1,500,000 (taking into account the multiple of earnings, revenue or other metric), after which point the Sellers shall be liable for all Losses from dollar one related to such damages based on a multiple of earnings, revenue or other metric." *Id.*

The Merger Agreement also establishes a true deductible of $300,000. The relevant provision states:

> No amount shall be payable by Purchaser or the Sellers, as applicable, as indemnification pursuant to this Article IX, except to the extent that the aggregate amount of Purchaser's or Sellers' Losses, as applicable, exceeds $300,000 (the "Deductible"), after which point Purchaser or the Sellers, as applicable, shall only be liable for all Losses of the Indemnified Party in excess of the Deductible. The limitations set forth in this Section 9.4(c) shall not apply to any liabilities and obligations that arose from (i) any breaches of the Company Fundamental Representations or the Seller Fundamental Representations, (ii) any breaches of any of the covenants, agreements, and obligations under this Agreement or any Transaction Document by the Company or the Sellers, (iii) fraud or willful misconduct of or by the Company or the Sellers, (iv) knowing or intentional misrepresentations or omissions of or by the Company or the Sellers, (v) indemnification obligations pursuant to the Specific Indemnities, or (vi) Losses related to defending any claims of appraisal rights made by any Seller, or enforcing or defending any similar rights or remedies related thereto (items (i) through (vi) of this Section 9.4(c) shall be referred to as the "Limitation Carve-Outs"); provided, that any indemnification claims related to any of the

43

Limitation Carve-Outs shall not be used in connection with the determination of the Deductible.

*Id.* § 9.4(c). One of the Limitation Carve-Outs addresses "any breaches of the Company Fundamental Representations," defined to include the Law Compliance Representation addressing healthcare law compliance. *Id.* §§ 9.4(b), 4.8. The Deductible also does not apply to losses calculated using a multiple of earnings, revenue, or other metric, because the language addressing that form of damages calls for a tipping basket of $1,500,000. The latter more specific provision controls over the more general Deductible.[46]

### 2. Damages For Breach Of The Counterparty Representation

The Buyers seek $3,155,546 in damages for breach of the Counterparty Representation.[47] To reach that figure, the Buyers' expert Scott Bouchner calculated the lost earnings from those two customers for LTM April 2018, including offsets for costs and expenses the Company would not have incurred. The lost earnings totaled $478,701.[48] The Buyers' expert then multiplied that figure by 6.7797, the multiplier

---

[46] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[47] The Buyers' expert originally calculated these losses to be $3,322,427. JX 1155 at 8. In his reply report, the expert corrected a calculation error, which the Sellers' expert had pointed out. Dkt. 368 at 77; JX 1160 at 19; JX 1161 Schedule 4.

[48] The Buyers' expert first determined the annual lost revenue for both customers. To do that, he multiplied their total gross revenue in LTM April 2018 by their customer-specific GNR ratio. JX 1155 at 14; Bouchner Tr. 1263–66. For that period, the Stanford account had gross revenue of $2,346,280 and a GNR of 29.23%

44

that the Buyers applied to the LTM April 2018 EBITDA to arrive at the Merger price. Last, the Buyers' expert deducted actual post-closing collections from both customers through July 2018—$89,903—for net damages of $3,155,546. JX 1155 at 15; Dkt. 368 at 77.

The Sellers argue that the Buyers cannot recover more than $433,322. They say the Buyers underestimated the operating expenses and costs that the Company saved from losing the two customers. They also argue that the Company was not permanently impaired by the loss of the two customers and therefore the court should not apply a multiplier.

The difference between the Buyers' pre-multiplier figure of $478,701 and the Sellers' figure of $433,322 turns on what "unincurred operating expense percentage" applies to the lost net revenue totals to capture expenses saved. The Buyers deducted

---

for net revenue of $685,712. JX 1155 at 15. For that period, the account for the Baptist Health System hospital that terminated its agreement had gross revenue of $502,819 and a GNR of 15.23% for net revenue of $76,751. *Id*. The total lost net revenue for both customers was $762,283.

The Buyers' expert next multiplied those lost earnings by the customer-specific gross margins. Stanford's gross margin was 79.62%, which applied to earnings of $685,712 results in lost gross profits of $545,956. *Id*. The Baptist Health System hospital had a gross margin of 49.52%, which applied to earnings of $76,751 results in lost gross profits of $37,917. *Id*. The total lost gross profits for both customers was $583,873.

The Buyers' expert then deducted operating expenses that the Company would no longer expend on these two customers. He calculated those expenses as 13.8% of total lost net revenue. *Id*. Applying that percentage to total lost revenue of $762,283 results in $105,172 in unincurred operating expenses. Bouchner Tr. 1265–66; JX 1161 Schedule 4. Deducting $105,172 from total lost gross profits of $583,873 results in projected lost income or EBITDA of $478,701.

13.8% from the lost net revenue figure; the Sellers argue for 19.75%, asserting that the Buyers failed to account for "professional fees relate[d] to a collection agency, software, legal and various consulting fees" and collection expenses "incurred for postage and delivery, electronic remittances for payments, printing claims and other one-off expenses." JX 1160 at 19–20. The parties agree that the professional fees as a percentage of total revenue equaled 2.62% and the collection expenses as a percentage of total revenue equaled 3.34%. JX 1155 Exhibit 6; JX 1160 at 19–20.

The Buyers argue against including a reduction for professional fees because no Company employees were fired as a result of the lost customers. Bouchner Tr. 1329–32; Dkt. 388 (Comvest Parties' Post-Trial Reply Brief) at 34. But the Company could have saved on professional fees and collection expenses without firing people. The Buyers also argue that Stanford had a high Gross-to-Net Ratio and therefore its loss would not result in saved collection costs or professional fees. Bouchner Tr. 1329–32; Dkt. 388 at 34. Not so. Stanford's company-specific Gross-to-Net Ratio was 29.23%, roughly the Company's historical average.[49] The Sellers therefore are correct that the two components should be added, resulting in lost earnings from the two customers of $433,322.

---

[49] JX 1155 at 15; JX 48 at 8 (November 2017 Comvest due diligence memo showing Gross-to-Net Ratio of 32.8% for 2014, 31.9% for 2015, 27.6% for 2016, and 21.1% for 2017); JX 17 at 25 (FTI report showing Gross-to-Net Ratio "per P&L" of 31.9% for 2015, 28.4% for 2016, and 30.8% through June 2017).

The Buyers next argue that the lost earnings should be multiplied by 6.7797, the multiple the Buyers applied to LTM April 2018 EBITDA in the Merger Agreement to calculate the Merger price. The Merger Agreement expressly contemplates a claim for damages "based on a multiple of earnings, revenue or other metric." JX 312 § 9.1(c). The Merger Agreement does not, however, require a multiple-based calculation, nor does it specify under what circumstances a multiple should be used.

Because the agreement is silent, the court must look to the common law.[50] Under the common law, a party can recover reasonable expectation damages based on a multiple where the price was "established with a market approach using a multiple."[51] That reasoning applies here.

---

[50] *See* Restatement (Second) of Contracts § 204 (Am. L. Inst. 1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 332 (Del. Ch. 2010) ("I look to the common law because this body of jurisprudence provides a backdrop of standard default rules that supplement negotiated agreements and fill gaps when a contract is incomplete, whether by inadvertence or design."), *aff'd*, 15 A.3d 216 (Del. 2011) (TABLE).

[51] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *18 (Del. Ch. Aug. 2, 2023). *See WaveDivision Hldgs., LLC v. Millenium Digit. Media Sys., LLC*, 2010 WL 3706624, at *23 (Del. Ch. Sept. 17, 2020) ("For present purposes, I find it appropriate to use a multiple of EBITDA analysis to calculate the value of Systems to Wave. That is the technique upon which Wave based its expectations . . . ."); *Cobalt*, 2007 WL 2142926, at *29 (awarding damages based on a cash flow multiple where "Jim Hilliard knew Cobalt was relying on a cash flow multiple in reaching the price it was willing to pay for WRMF"); *Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *7 (Del. Ch. Aug. 25, 2020) ("[I]t is reasonably conceivable that an EBITDA multiple could support a damages calculation. Plaintiff alleges that the parties discussed using an EBITDA multiple to calculate the purchase price and that the Buyers, in fact, did so."); *Taylor Precision Prods., Inc. v. Larimer Gp., Inc.*, 2023 WL 6785802, at *5 (S.D.N.Y. Oct. 13,

The Buyers proved that they derived the Merger price by applying a multiple of 6.7797 to the Company's EBITDA.[52] The court will calculate damages using the same multiple.

The Sellers respond that applying a multiple only makes sense where the losses permanently affected the business, citing *Zayo Group, LLC v. Latisys Holdings, LLC*.[53] That decision declined to apply an EBITDA multiple where there was "no evidence that [the buyer] actually based its purchase price on a multiple of EBITDA."[54] The court also declined to apply a multiple because "all of the Material

---

2023) ("Plaintiff has isolated the effects of the breach by calculating the TTM adjusted EBITDA ($593,670.00) of the lost SKUs and subtracting that from the TTM EBITDA and applying the purchase price multiple of 7.55x, which itself is derived from the original purchase price of $69.5 million."); *see also Tam v. Spitzer*, 1995 WL 510043, at *12 (Del. Ch. Aug. 17, 1995) ("The only credible valuation of Data Works without [the client] is that of [plaintiff's expert], who employed the same discounted cash flow methodology and valuation data he had previously used to arrive at the 1991 purchase price, but then deducted the revenue and expenses attributable to [the lost client].").

[52] *See* JX 273 at 2 (May 7, 2018 Comvest investment committee update valuing the Company as a multiple of EBITDA); Marrero Tr. 758–62; 851–52. The Sellers' expert conceded that the Buyers based the Merger purchase price on a multiple of EBITDA. Steffens Tr. 1206; *see also* JX 231 (Ferreira admitting to Einwechter in an April 1, 2018 email that Comvest was justified in revising the EBITDA downward and that "[m]ultiples on sub-$5M EBITDA businesses are lower—definitely not 8 times"). The Sellers point out that Marrero testified that, as a general matter, Comvest uses other metrics to value transactions. Dkt. 385 at 64 (citing Marrero Tr. 821–22). But Marrero never testified that Comvest calculated the Merger price using any other metric than a multiple of EBITDA.

[53] 2018 WL 6177174 (Del. Ch. Nov. 26, 2018).

[54] *Id.* at *17.

48

Contracts at issue in this case expired in less than one year" and therefore the related misrepresentation did not "cause[] a permanent diminution in the value of the business (as a result of lost revenues into perpetuity)."[55]

The reference to a "permanent diminution . . . into perpetuity" was descriptively accurate on the facts of that case, but it does not translate into a test for future cases. Nothing lasts forever. Whether a misrepresentation diminishes the value of the business sufficiently to warrant applying a multiple turns on the extent to which the misrepresentation affects future earning periods.[56]

Here, the customer losses resulted in recurring declines in revenue. Once Stanford left and Baptist Health System reduced its commitment, the Company would never earn revenue from their contracts. True, as the Sellers argue, the Company might find other customers, but revenue from the new customers would be

---

[55] *Id.* at *16. The court cited no legal authority for the "permanent diminution" proposition.

[56] *See, e.g.*, *NetApp*, 2023 WL 4925910, at *20 ("This did not amount to a one-time loss for NetApp, but would continue to affect future cash flows. In these circumstances, dollar-for-dollar damages would not make NetApp whole."); *see also* Association of International Certified Professional Accountants, *Forensic & Valuation Services Practice Aid: Mergers & Acquisitions Disputes* 58 (2020) (updated Jan. 1, 2020) ("Claims that result in dollar-for-dollar damages are typically those that have a one-time effect on the target and that do not impact the target financial condition in future periods (in other words, will not affect future cash flows)."), *cited in NetApp*, 2023 WL 4925910, at *20 n.256. Although the Buyers' expert properly applied a multiple to lost earnings, he was confused as to whether his calculation was based on the future effects the loss of the customers would have on the Company. *See* Bouchner Tr. 1324–28.

additive if the Company could have retained Stanford and the fifth Baptist Health System hospital.

For the same reason, the Sellers' argument that the Buyers failed to mitigate damages fails. The Sellers could not "mitigate" the damages from the lost customers by obtaining new customers. The Buyers could only mitigate their losses from the two customers by cutting expenses or somehow convincing the customers to come back. The Sellers bore the burden of proving that the Buyers failed to mitigate damages by not using reasonable efforts to reacquire them.[57] The Sellers failed to meet their burden.[58]

The Sellers also suggest that a court must find fraud to apply a multiple to calculate damages. A court can apply a multiple to address fraud, but fraud is not required to apply a multiple. That is particularly so here where the Merger Agreement contemplates multiple-based damages.

Finally, the Sellers argue that the Buyers used the wrong multiple. The Sellers say the multiple of 6.7797 should be 4.9168 because the Buyers' expert calculated

---

[57] *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *20 (Del. Ch. Sept. 19, 2017), *aff'd*, 188 A.3d 824 (Del. 2018) ("Failure to mitigate damages is an affirmative defense, and the burden of proving the failure falls upon the defendant." (internal quotation marks omitted)).

[58] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009) ("A non-breaching party need not hazard undue risk, burden, or humiliation in mitigating costs and damages. Mitigation is subject to a rule of reasonableness, and whether a loss is mitigable turns on the circumstances." (footnote omitted)).

EBITDA over a period greater than one year. But that argument misunderstands what the Buyers' expert did. The Buyers' expert correctly used the period from January 2015 through April 2018 to derive an average percentage for unincurred operating expense. The Buyers' expert used LTM April 2018 EBITDA to derive the multiple and correctly reached a multiple of 6.7797.

At trial, the Buyers proved that the Sellers' misrepresentation resulted in $433,322 in lost earnings. Multiplying the lost earnings by 6.7797 results in an overpayment of $2,937,793. Deducting post-closing collections for both customers through July 2018—$89,903—equals $2,847,890 in damages.

### 3. Damages For Breach Of The Law Compliance Representation

For the Sellers' breach of the Law Compliance Representation, the Buyers seek to recover the expenses they incurred dealing with the undisclosed TPE audit, the First Zone 4 ZPIC Audit, and 2017 RAC Audit. That is a proper measure of damages.

The Buyers seek to recover:

- $90,550 paid to Grant Thornton and $124,384 paid to McDermott Will & Emery for an acquisition that the Buyers say the Company aborted because of a cash-flow shortage caused by the undisclosed audits;

- $91,952 paid to "Lender Counsel" and $80,057 paid to McDermott Will & Emery to secure a loan that the Buyers say the Company secured to address the cash-flow shortage caused by the need to address the undisclosed audits; and

- $159,291 paid to van Halem to advise on the undisclosed audits.

In total, the Buyers seek indemnification for $546,235 in fees.

The losses attributable to "unexpected cash flow problems" are too attenuated to recover. They reflect consequential damages, defined as damages that "do not flow

51

directly and immediately" from the breach.[59] A plaintiff only can recover consequential damages if they were foreseeable at the time of contracting.[60] At trial, the Buyers did not prove that the Sellers foresaw at the time of contracting that their failure to disclose the audits would result in the Company being unable to finance an acquisition or being forced to obtain a loan. "The law does not . . . promote speculative damages at the [defendant's] expense."[61]

The Buyers also failed to prove that the undisclosed audits were the but-for cause of the Company's decision to abandon the acquisition. The record indicates that the Company made its decision based on other factors. *See* JX 457 at 22. The Buyers similarly failed to prove the reasonableness of the amount they sought in connection with the loan, because the invoices on which they relied were excessively redacted. *See, e.g.*, JX 472; *see also* JX 287 at 2 (listing $91,952 in unspecified loan transaction fees and expenses).

---

[59] *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at \*6 (Del. Ch. Feb. 16, 2011) (internal quotation mark omitted); 24 Williston on Contracts § 64:12 (4th ed. 2024 Update).

[60] *Pharm. Prod.,* 2011 WL 549163, at \*6; *see* Restatement (Second) of Contracts § 351(1) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee . . . .").

[61] *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 689 (Del. Ch. 1996) (internal quotation marks omitted).

That leaves $159,291 in fees to van Halem. The trial record supports the Buyers' argument that the van Halem Group helped the Company address the undisclosed audits:

- In a June 21, 2018 email to Eckberg, Black states the Company had discovered the TPE audit and was "quickly bringing in professional and legal experts in the area . . . to address the situation." He then states, "[W]e will be working closely with Van Halem, Brown & Fortunado and McDermott Will & Emery to ensure we are a compliant company." JX 381.

- An August 1, 2018 Company quarterly business review states, "Utilizing vHG Clinical Staff to review TPE-focused claims prior to submission." JX 435 at 6.

- An August 13, 2018 Company memo states, under the heading "Round 3 TPE began 8/3/18," "Van Halem Group (vHG) has also been assisting with pre-screen reviews in readiness for the next round." JX 442 at 5.

- In a September 28, 2018 monthly business report, the Company states that it "continue[s] to work closely with van Halem Group" while discussing the TPE audit and "one additional ZPIC audit since August QBR (2017 audit with 69% error rate[,] not disclosed by seller)." JX 457 at 7. That is the First Zone 4 ZPIC Audit. *See* JX 98 at 1.

- A July 22, 2019 investment committee memo states that the TPE Reviewer "reached out to van Halem Group . . . to let them know that the auditors will be meeting to discuss next steps given limited billings." JX 608 at 2.

The trial record showed that the van Halem Group also was helping the Company overhaul its billing system and ensure compliance, not simply addressing the undisclosed audits.[62]

---

[62] *See, e.g.*, JX 434 at 6 (an August 1, 2018 Company quarterly business review stating, under "Current Plan for Release of Claims," "vHG to audit first 10 claims that have passed the QC Checks"); JX 381 ("[W]e will be working closely with Van Halem . . . to ensure we are a compliant company . . . .").

The Buyers' expert totaled the van Halem Group fees from invoices that the Buyers provided him.[63] The invoices included billed items that related to the undisclosed audits.[64] The invoices also included other billed items that appear to be unrelated to the undisclosed audits.[65] Other items could go either way.[66] The Buyers' expert did not attempt to separate the work that van Halem performed to address the undisclosed audits from the work it performed to address CMS compliance in general or other tasks that van Halem billed.

"The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."[67] "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[68] The Buyers' invoices did not provide the court "mathematical certainty" for

---

[63] JX 1155 at 18 n.41; JX 370; JX 426; JX 437; JX 448; JX 458; JX 463.

[64] *See, e.g.*, JX 426 at 2–3 ("Call with Kim and Tim to talk about TPE audits"); JX 458 at 1 ("[R]eviewed additional L4361 claims denied and approved during phase 2 TPE to compare on what TPE auditor is looking for").

[65] *See, e.g.*, JX 370 at 1 ("Research and questions answered from Tosha"); JX 426 at 1 ("Review of LMN template with feedback to Kim via email").

[66] *See, e.g.*, JX 370 at 1 ("[P]roviding audit report details to Rick for Jonathan"); JX 426 at 4 ("4 ADR reviews completed (crutches, wrist brace)").

[67] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, C.).

[68] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

determining damages, but they do provide the court a "basis to make a responsible estimate of damages."

Without pretense of precision, the court awards the Buyers $100,000, approximately two-thirds of the van Halem fees. The Company paid van Halem fees to address the undisclosed audits, to overhaul the billing system, and to comply with CMS requirements in general. The Buyers are entitled to recover the entirety of the first bucket. But the undisclosed audits also contributed to the Company's need to overhaul the billing system and focus on meeting CMS requirements. The Buyers therefore are entitled to half of the other two buckets.

Because these fees were incurred in connection with a breach of Section 4.8, which is a Company Fundamental Representation, the $300,000 deductible in Section 9.4(c) does not apply. The Buyers are entitled to $100,000 in damages as a result of the Sellers' breach of the Law Compliance Representation.

## F. The Seller Representative's Claims For Breach Of Contract

The Seller Representative has asserted claims against the Buyers for breach of contract. First, the Seller Representative asserts that the Buyers breached the implied covenant of good faith and fair dealing in the Merger Agreement and the Seller Note by withholding Medicare claims. Second, the Seller Representative asserts that Comvest, Black, and Marrero tortiously interfered with the Merger Agreement and Seller Note by causing Holdings and Dura Medic to breach the implied covenant of good faith and fair dealing.

### 1.    Breach Of The Implied Covenant

The Seller Representative asserts that the Buyers breached the implied covenant of good faith and fair dealing in the Merger Agreement and Seller Note by withholding Medicare claims over a period of eight months. The Seller Representative contends that the Buyers willingly depressed the Company's short-term revenue because the Buyers could recover more money than they lost by (i) pursuing an indemnification claim and (ii) avoiding paying the Seller Note. Dkt. 358 (Sellers' Opening Post-Trial Brief) at 45–46, 50–52; Dkt. 385 at 9–14.

"The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[69] When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[70] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[71] The court

---

[69] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[70] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER).

[71] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[72] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[73]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled."[74] One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table."[75]

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[76] "In only a moderately complex or extend[ed] contractual relationship,

---

[72] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[73] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (ORDER).

[74] *Allen*, 113 A.3d at 183.

[75] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

[76] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible."[77]

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[78] "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[79]

Applying these principles, the Delaware Supreme Court has made clear that the implied covenant restrains a party's exercise of discretion under an agreement. As a general rule, a party cannot engage in arbitrary or unreasonable conduct that prevents the counterparty from receiving the fruits of its bargain. That rule operates with special force "when a contract confers discretion on a party."[80] At a minimum, the implied covenant requires that the party empowered with the discretion to make a determination "use good faith in making that determination."[81]

---

[77] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[78] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting Corbin on Contracts § 570 (Kaufman Supp. 1984)).

[79] *Dieckman*, 155 A.3d at 361.

[80] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021).

[81] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

But what does it mean to exercise discretion "in good faith" and not arbitrarily or unreasonably for purposes of the implied covenant? A reviewing court does not simply introduce its own notions of what is "fair or reasonable under the circumstances."[82] The implied covenant "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[83] When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract."[84] The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[85] The application of these concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."[86] When applied to an exercise of discretion, this means that the exercise of discretionary authority must fall within the range of what the parties would have agreed upon during their original negotiations, if they had thought to address the issue.

---

[82] *Allen*, 113 A.3d at 184.

[83] Restatement (Second) of Contracts § 205 cmt. a.

[84] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (cleaned up), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[85] *Id.* (cleaned up).

[86] *Id.* (cleaned up).

The Seller Representative argues that the Merger Agreement and Seller Note have two gaps that the implied covenant should fill:

- Section 2.3(a) of Merger Agreement requires the Buyers to provide the Sellers with post-closing calculations of the "Final Working Capital," which "shall include all accounts receivable amounts in respect of devices provided or services performed on or prior to the Closing Date." JX 312 § 2.3(a).

- Article IX of the Merger Agreement authorizes the Buyers to seek indemnification for breaches of the Company's representations and warranties, and the Seller Note authorizes the Buyers to offset any amounts due on the Seller Note with the amount of any indemnification claim. *Id.* Article IX; JX 414 at 9–13.

The Seller Representative asserts that these provisions confer discretion on the Buyers but do not establish a standard for exercising that discretion. The Seller Representative argues that the Buyers reached the implied covenant by failing to exercise their discretion reasonably.

Under Section 2.3(a) of the Merger Agreement, the Buyers have discretion over how to address the Company's pre-closing accounts receivable as part of the post-closing purchase price adjustment. The Seller Representative argues that the implied covenant requires "that the Company would continue to operate the business in the ordinary course and try to collect its pre-Merger receivables." Dkt. 358 at 51. In other words, the Buyers had to treat the pre-closing accounts receivable the same way the Company treated them pre-closing.[87]

---

[87] Dkt. 358 at 51 (seeking to include "an implied term that the Company *would continue* to operate the business in the ordinary course and try to collect its pre-Merger receivables") (emphasis added); Dkt. 385 at 10 ("Leard's testimony supports what the Sellers did pre-closing: billing claims that have the necessary information

At trial, the Seller Representative failed to prove that, at the time of contracting, the Buyers would have agreed to treat the pre-closing accounts receivable the same way the Company treated them pre-closing.[88] No hypothetical counterfactual is necessary because the Buyers expressly stated that they intended to withhold all Medicare claims and overhaul the billing process. On May 30, 2018, a week before the Merger closed, Tidd reported to Black, Callahan, and Carroll that "[u]pon close, I have informed Kim [Sauber] to stop all Medicare claims from billing until we have a QC process in place that ensures that the only claims that go out are clean." JX 335 at 1. Black agreed. Black Tr. 242, 247. Whether Sauber communicated this information to the other Sellers does not matter. Tidd's report to Black and Callahan shows that the Buyers would not have agreed to continue the pre-closing practices. They intended to overhaul the Company's billing procedures.

The Seller Representative also failed to identify "express terms" of the Merger Agreement that "naturally imply" a continuation of the Company's pre-closing billing

---

and working to track down missing information for those that do not. That is what a good-faith actor would have done." (footnote omitted)).

[88] *Baldwin v. New Wood Res., LLC*, 283 A.3d 1099, 1118 (Del. 2022) ("When determining the parties' reasonable expectations, the court analyzes 'whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose.'").

practices.[89] Section 2.3(a) of the Merger Agreement, on which the Seller Representative relies, states that the Buyers' calculation of "Final Working Capital"

> shall include all accounts receivable amounts in respect of devices provided or services performed on or prior to the Closing Date (and remaining uncollected as of the Closing Date), to the extent such accounts receivable were collected (i.e., converted to cash) *within 730 days following the Closing* . . . .

JX 312 § 2.3(a) (emphasis added). The Seller Representative complains that the Buyers withheld all Medicare claims for eight months, i.e., around 240 days. But under Section 2.3(a), the Final Working Capital calculation encompasses 730 days, triple the time the Buyers withheld Medicare claims. That time frame was sufficiently lengthy to allow for delays in processing claims attributable to a revamped billing system. It does not support the Seller Representative's argument.

Section 4.5(d) also does not help the Seller Representative. It states that all "accounts receivable set forth on the Recent Balance Sheet and . . . accruing through the Closing Date . . . are valid and enforceable claims." JX 312 § 4.5(d). That language does not imply that the Buyers had an obligation to pursue every claim. It enabled the Buyers to seek indemnification for amounts that were not valid or enforceable claims.

Finally, the Seller Representative points to the indemnification set-off rights in Article IX of the Merger Agreement and Section 16 of the Seller Note. The Seller Representative argues that the existence of set off rights means the parties would not

---

[89] *See id.* at 1117.

have permitted a pause on Medicare claims; rather, those provisions assumed attempts at collection.[90] That does not follow. The inclusion of set-off rights does not suggest an agreement on billing policy.

The Buyers believed that they had to overhaul the billing system to achieve J-curve growth. That was not an arbitrary or irrational exercise of discretion. It was a reasonable decision consistent with the Buyers' pre-closing plans for the Company. The Seller Representative cannot invoke the implied covenant to impose an obligation that they "failed to secure . . . at the bargaining table."[91]

## G. Tortious Interference With Contract

The Seller Representative also contends that Black, Marrero, and Comvest tortiously interfered with the Merger Agreement and the Seller Note. This claim fails because the Seller Representative failed to prove an underlying breach of contract.

The elements of a claim for tortious interference with contract are "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[92] The only breach of contract the Seller Representative sought

---

[90] *See* Dkt. 358 at 51 ("Attempted collection was assumed by the indemnification set-off rights in the Merger Agreement and the Seller Note, as otherwise the Seller Note would be rendered worthless by Comvest's ability opportunistically to depress earnings and seek indemnity.").

[91] *See Aspen Advisors*, 843 A.2d at 707.

[92] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted).

to prove involved the implied covenant. A proven claim for breach of the implied covenant can support a claim for tortious interference.[93] Here, the Seller Representative failed to prove that claim. Lacking an underlying breach of contract, the tortious interference claim fails.

## III. CONCLUSION

At trial, the Buyers proved that the Sellers breached representations and warranties in Article IV of the Merger Agreement. For the breach of Section 4.23 of the Merger Agreement, the Buyers proved damages of $2,847,890, plus pre-judgment interest that accrues from June 6, 2018, and post-judgment interest that accrues until payment. For the breach of Section 4.8(a) of the Merger Agreement, the Buyers proved damages of $100,000, plus pre-judgment interest that accrues from December 31, 2018, and post-judgment interest that accrues until payment. Interest will accrue at the legal rate, compounded quarterly, with the interest rate changing in conjunction with changes in the reference rate.

The Buyers failed to prove their other claim. The Seller Representative failed to prove its claims for breach of the implied covenant and for tortious interference.

The parties will submit a form of order implementing the rulings in this decision and *Dura Medic I*. If there are issues that still need to be resolved at the trial court level, the parties will submit a joint letter identifying them and proposing a process for bringing the case to a conclusion.

---

[93] *See NAMA Hldgs*, 2014 WL 6436647, at \*25–27.